IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CALLAHAN, et al., | * | |
| Plaintiffs | * | |
| v. | * | Civil Case No. 15-02815-JMC |
| Toys "R" US-DELAWARE, Inc., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \*

## MEMORANDUM AND ORDER

Plaintiffs, Virginia Callahan and T.G. (a minor), brought this products liability action against Defendants, Toys "R" US-Delaware, Inc. ("Toys 'R' US") and Pacific Cycle, Inc. ("Pacific"), following an accident that occurred in 2012 involving T.G. and a bicycle that was manufactured, assembled, and sold by Defendants. Plaintiffs originally filed their complaint in the Circuit Court for Howard County, and Defendants later removed to this Court under diversity jurisdiction. (ECF No. 1). Subsequently, the parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4. (ECF Nos. 70, 72).

Following a four-day trial, the jury returned a special verdict finding that that there was no defect in the bicycle, whereupon an Order of Judgment was entered in favor of Defendants on all counts. (ECF Nos. 114, 117). Plaintiffs have since filed a motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. (ECF No.125). Defendants filed their response, (ECF No. 128), Plaintiffs have not filed any reply brief, and the Court finds that no hearing is necessary. Loc. R. 105.6 (D. Md. 2016). For the reasons that follow, Plaintiffs' motion is DENIED.

1

In support of their motion, Plaintiffs contend that the Court "made several reversible errors which require the granting of a new trial." Specifically, they contend: (1) that the Court erred when it permitted Defendants to "vary their theories and evidence from what they put in the Pretrial Order and turn this case from a personal injury case into an inquest into evidence tampering"; (2) that the Court erred "when it granted a spoliation instruction and allowed Defendants to argue that Plaintiffs and their counsel had tampered with evidence"; (3) that the Court erred in "granting a motion in limine that prohibited the jury from inspecting and touching the bike and from taking the bike. . . into the jury room"; (4) that the Court erred in not allowing the jury to test and inspect the bicycle as impeachment evidence of Defendants' expert; and, (5) that the Court erred in excluding undisclosed evidence of testing performed by Plaintiffs' expert.[1]

Following a jury trial, Federal Rule of Civil Procedure 59(a) "allows the court to grant a new trial on all or some issues 'for any reason for which a new trial has heretofore been granted in an action at law in federal court.'" Jackson v. Egira, LLC, No. CV RDB-14-3114, 2016 WL 6583604, at *2 (D. Md. Nov. 4, 2016) (citing Fed. R. Civ. P. 59(a)(1)(A)). "Because every litigant is entitled to one fair trial, not two, the decision of whether to grant or deny a motion for a new trial lies within the discretion of the district court." Id. (internal citations omitted). "The court must exercise its discretion to grant a new trial only if the verdict (1) is against the clear weight of the evidence, (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Id. (internal citations and quotations omitted). "Granting a new trial is not warranted unless it is reasonably clear that prejudicial error has crept into the record or that

---

[1] The Plaintiffs' introductory list of contentions (specifically, numbers four and five) does not accurately correspond to the substantive arguments made in the body of their motion.

substantial justice has not been done." Id. Notably, evidentiary errors are harmless if the Court can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the errors." Taylor v. Virginia Union Univ., 193 F.3d 219, 235 (4th Cir.1999) (internal citations, quotation marks, and brackets omitted).

### A. Defendants' Allegedly Undisclosed Change In Theory

Plaintiffs contend that the Court erred in permitting Defendants to present a theory at trial that was not disclosed in their pretrial memorandum. Specifically, according to Plaintiffs, Defendants' "most important" theory that was disclosed in their pretrial memorandum and advanced during the first three days of trial was that the bicycle did not contain a defect. Yet, Plaintiffs argue, Defendants "completely changed their tactic and all but admitted that the rear brake was defective" on the third day of trial when Defendants noted that the pressure necessary to squeeze the rear brake was different at the time of trial than it had been during Defendants' expert's original inspection. Plaintiffs contend that "[i]n order to account for this change in tactic, Defendants had to blame someone for the allegedly changed condition." Thus, they assert, Defendants put forward this new, undisclosed theory that Plaintiffs and their counsel had tampered with the evidence.

The Court does not agree with Plaintiffs' underlying assertions or logic. First, at several instances prior to trial, Defendants made known their belief that the condition of the bicycle "today" (i.e., as it was near the date of the trial) was not the same as it had been at the time of the accident. For example, Defendants' motion in limine, (ECF No. 81), which was submitted on the same date and in conjunction with Defendants' pretrial memorandum, (ECF No. 80), sought to exclude from trial any in-court testing of the bicycle by Plaintiff's expert and by the members

of the jury because, among other reasons, Plaintiffs could not establish that the condition of the bicycle was in the same condition as it was when the accident occurred.[2]

Second, on the third day of trial, the Court allowed Mr. Logan to squeeze the brake outside the presence of the jury after learning that Plaintiffs had given this same opportunity to their own expert. In doing so, Mr. Logan observed that, in his opinion, the brake was much harder to squeeze compared to what he had previously assessed (and videotaped) by a two-finger test at his prior inspection in November 2015. Given that the bicycle had been in the custody of Plaintiffs since that time and that Mr. Logan would have no reason to suspect that the brake would feel any different, there is no way he could have disclosed this "new" opinion ahead of time. Far from an abandonment of his opinion, that at the time of the accident (and his 2015 inspection) the brake was not defective (as the jury, in fact, found), this in-court observation was simply supportive of Defendants' position that the bicycle's condition at the time of trial was not the same as at the time of the accident.

Third, during the course of trial, it became apparent to the Court and the parties themselves that the bicycle's condition had, in fact, changed from when it was originally inspected by Mr. Logan, in 2015. Though the parties disagree about their significance, two changes were apparent: (1) the seating of the "barrel" at the end of the rear brake cable was different from how it appeared in Mr. Logan's 2015 inspection photos (Tr.[3] at 632-640, 657-659, 690-692); and, (2) the position of the handlebars relative to the alignment of the front wheel was different from Mr. Logan's inspection photos (Tr.[2] at 207-210; Tr.[3] at 618-619, 636). The first change was important to Mr. Logan's opinion regarding the "stickiness" with which the brake handle went back into position after release, and the second change was important to Mr.

---

[2] Defendants argued in their motion in limine: "the bicycle and back brake may have changed during the four years since the accident. The condition of the brake system on the bicycle can change over time, even if the bicycle hasn't been used." (ECF No. 81, page 20).

4

Logan's theory that the Plaintiffs' accident scenario was inconsistent with the physical evidence. Mr. Logan also testified that neither change, in his opinion, could have occurred absent purposeful effort. (Tr.³ at 655, 691). As with his observation about the increased pressure necessary to operate the rear brake at the time of trial, Mr. Logan could not have disclosed these post-inspection changes in the barrel and handlebar orientation given that the bicycle had remained in the possession of Plaintiffs since that time.

In summary, Plaintiffs were on notice of Defendants' assertion that the condition of the bicycle at trial was no longer substantially similar to its condition at the time of the accident. Additionally, given that the bicycle was in the Plaintiffs' sole custody and control from the time of Mr. Logan's 2015 inspection, Defendants as a practical matter could not have provided any additional notice of Mr. Logan's observations and evidence at trial that the condition of the bicycle had been changed from the time of his inspection. Further, at no point did Defendants abandon their "most important" argument that the rear break was not defective on the day of the accident. This argument was made during Defendants' opening and closing statements (Tr.¹ at 114-118; Tr.⁴ 83); supporting testimony for this argument was elicited through their key witness, Mr. Logan, who said (and showed via a video recording) that the brake functioned properly when he originally inspected it in 2015; and the argument was clearly one that the jury found compelling as it returned its verdict that there was no defect in the bicycle.

### B. The Court's "Spoliation" Instruction Regarding the Post-Inspection Changes in the Bicycle's Condition

Plaintiffs' next argument concerns the Court's instruction to the jury regarding the change in the position of the bicycle's handlebars relative to the alignment of the front wheel. As indicated above, Mr. Logan inspected the bicycle in November 2015, and then again during trial. Following that latter inspection, Defendants brought to the Court's attention that the orientation

5

of the bicycle's handlebars in relation to the front wheel was significantly different from when Mr. Logan had previously inspected it in 2015. Specifically, Mr. Logan explained, with still-framed pictures of his 2015 recorded inspection as support, that at the time of his 2015 inspection, the alignment between the handlebars and the front wheel was off by roughly 30 degrees. (Tr.[3] at 636-640). This, he explained, was noticeably different from the current condition of the bicycle (that is, the condition of the bicycle as it appeared in court) which had near-perfect alignment between the handlebars and front wheel.

Furthermore, Mr. Logan noted that this change was not easily done. Rather, he testified that it required a forceful manipulation to bring the handle bars and tire back into correct alignment.[3] (Tr.[3] at 654-655). Indeed, Plaintiffs' counsel, on several occasions, acknowledged that changing the orientation between the front wheel and handlebars required a purposeful act of force.[4]

Given this testimony, and the obvious change in the condition of the bicycle, Defendants requested that the Court give a "spoliation" instruction to the jury. In considering Defendants' request, the Court focused on whether such a change was at all significant to the issues and theories advanced at trial. Specifically, the Court noted that Plaintiffs' theory of the accident was a "pitch-over," whereby, as a result of the alleged rear brake failure, T.G. over-engaged the front brake, pitching her forward over the handlebars. Defendants, on the other hand, argued that this was an accident brought on by "user error" resulting in what Mr. Logan called a "side-spill." (Tr.[3] at 639). As support for this causation theory, Mr. Logan noted that the post-crash

---

[3] Specifically, Mr. Logan testified that this alteration could not have occurred inadvertently. He opined that the physical force required to bring about this alteration indicated that it was intentionally done. (Tr.[3] at 654-655).

[4] For example, in explaining how this alteration may have occurred, Plaintiffs' counsel stated: "[It's] very simple to do it. As far as I'm concerned, we can do it right now. It's nothing to do it. You straddle the wheel, as the witness said, and you turn the handlebars a little bit." (Tr.[4] at 9).

6

misalignment of the handlebars, which was off by 30 degrees at the time of his product inspection, was more consistent with a "side-spill" type of accident caused by rider error rather than a "pitch-over" caused by a failure of the rear brake as argued by Plaintiffs.

Because there was no dispute that the alignment between the handlebars and front wheel was now different, that the alteration would have required a purposeful act, that the bicycle had been in the exclusive possession of Plaintiffs, Plaintiffs' counsel, or Plaintiffs' expert, and that the condition of the bicycle at the time of Mr. Logan's inspection was more favorable to Defendants' theory of the accident while the changed condition of the bicycle was supportive of Plaintiffs' theory, (Tr.[3] at 636-640), the Court gave the following instruction:

> The condition of the front wheel of the bicycle and its position relative to the handlebar has changed between the time Defendants' expert inspected the bicycle and today. The bicycle was in the possession of the plaintiffs during that time.
>
> The position of the front wheel relative to the handlebar was evidence material to Defendants' expert opinion in this case. Therefore, you may, but are not required, to infer that the position of the front wheel relative to the handlebar was in a condition favorable to the Defendants, and unfavorable to the Plaintiffs before this change.
>
> If you make this inference, you should consider it in light of all of the other evidence offered in the case as you reach your verdict.

(Tr.[4] at 11-14).

Plaintiffs contend that the Court erred in giving this "spoliation" instruction to the jury, and in turn allowing Defendants to argue that Plaintiffs and their counsel had "tampered with" evidence,[5] because there was no evidence that the altered condition was "willful." Plaintiffs further argue that Defendants never requested that the bicycle be preserved following the accident, and that the position of the handlebars "was not relevant to the issue of whether the

---

[5] In terms of the Defense counsel's reference to these issues in closing argument, the Court notes that there were no objections raised by Plaintiffs during the closing, nor does the Court view the closing as unfairly prejudicial so as to require a new trial.

7

back brake was defective." The Court disagrees. The instruction accurately represented the undisputed facts, it was consistent with our caselaw regarding spoliation of evidence, and it was narrowly-tailored.

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) (internal citations omitted). "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct which abuses the judicial process." Silvestri, 271 F.3d at 590 (internal citations omitted). In order to prove spoliation that warrants a sanction, a party must show that:

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

Charter Oak Fire Ins. Co. v. Marlow Liquors, LLC, 908 F. Supp. 2d 673, 678 (D. Md. 2012) (internal citations, quotations, and brackets omitted); see also Sampson v. City of Cambridge, Md., 251 F.R.D. 172, 179 (D. Md. 2008) ("This standard applies when a party is seeking any form of sanctions for spoliation, not just an adverse inference jury instruction").

"Upon a showing that spoliation has occurred, a court can impose sanctions molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." Charter Oak Fire Ins. Co., 908 F. Supp. 2d at 678 (internal citations and quotations omitted). "The court has significant discretion to consider a wide range of sanctions both for the purpose

of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." Id. (internal citations and quotations omitted).

1. *The Duty to Preserve Evidence*

"The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." Silvestri, 271 F.3d at 591 (internal citations omitted). Here, the bicycle was the single most important piece of evidence in the case, as Plaintiffs' action alleged various theories of strict liability, negligence, and breach of warranty, all of which related to the condition of the bicycle when it left the custody and control of Defendants, and the subsequent operation of the bicycle at the time of the accident. Thus, Plaintiffs knew, or at least should have known, that the bicycle itself would be relevant to issues (like theories of causation) that would arise during the course of this litigation. Additionally, Plaintiffs' suggestion that they had no obligation after Mr. Logan's inspection to keep the bicycle in the same condition, is undermined by Plaintiffs' counsel repeated representations[6] to the jury and the Court that the bicycle was in the same condition as it was at the time of the accident, yet in at least one key respect from Defendants' perspective, the bicycle's condition had changed.[7]

---

[6] For example, on the first day of trial, Plaintiffs' counsel represented to the Court: "our testimony is going to be that [the bicycle has] never changed anything [sic] since [the accident], and we gave them the video of when it was first inspected. There is no doubt that the bike is in exactly the same condition." (Tr.[1] at 41); and in the statement of facts of their pretrial memorandum, Plaintiffs wrote: "The bike was not altered since the accident and was made available for inspection by Defendants' experts on two occasions." (ECF No. 80, page 5).

[7] Plaintiffs argue that "[t]he spoliation instruction was particularly inappropriate since Defendants never requested that the bike be maintained after inspection," citing various decisions from outside this jurisdiction that purportedly support that argument. The Court is not aware of any decision from this Court or the Fourth Circuit which would impose an affirmative duty on Defendants to request preservation of the bicycle—the critical piece of evidence in this case—once Plaintiffs had notice that bicycle's condition and operation at the time of the accident would be critical the issue of causation.

2. *Culpable State of Mind*

"The second consideration for resolving a spoliation motion is to determine whether the alleged spoliator acted culpably. Any fault—be it bad faith, willfulness, gross negligence, or ordinary negligence—is a sufficiently culpable mindset." Charter Oak Fire Ins. Co., 908 F. Supp. 2d at 680 (internal citations, quotations, and brackets omitted). In particular, "[n]egligence, or culpable carelessness, is the failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation. Gross negligence, which is something more than carelessness, differs from ordinary negligence only in degree, and not in kind." Id. at 680–81 (internal citations, quotations, and brackets omitted); see also First Mariner Bank v. Resolution Law Grp., P.C., No. CIV. MJG-12-1133, 2014 WL 1652550, at *9 (D. Md. Apr. 22, 2014) ("Spoliation does not result merely from the negligent loss or destruction of evidence. Rather, the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction. Although the conduct must be intentional, the party seeking sanctions need not prove bad faith") (internal citations and quotations omitted).

The parties declined the option of having a separate hearing so as to determine the exact circumstances and causes regarding the altered position of the handlebars relative to the alignment of the front wheel. (Tr.[3] at 686-687).[8] As a result, in determining whether the physical alteration of the evidence was accompanied by a sufficiently culpable mindset, the available evidence before the Court is: (1) that the bicycle was in the exclusive control of Plaintiffs from the time of the accident up to and including the time of trial; (2) that the changed condition in the bicycle was more favorable to Plaintiffs' theory of the case; and, (3) that the only testimony that

---

[8] Plaintiffs state in their brief that this "alteration likely occurred when the bike was transported in the back of a motor vehicle but the record is devoid of any evidence of intentional tampering."

was offered regarding the type of act or force that would be required to bring about this sort of change was Mr. Logan's opinion that the alteration was done intentionally (as opposed to the alteration being attributed to simple mishandling or environmental factors) and Plaintiffs' counsel's statements that he could perform the alteration by straddling the wheel and turning the handlebars.

Given this record, the Court is comfortable in concluding that that the change in the bicycle's condition was brought about by a purposeful act. While there is no direct evidence to suggest that this act was done with a nefarious or deceptive purpose, the principles from this Court regarding the spoliation of evidence do not require a finding of deception or bad faith for sanctions to be imposed. First Mariner Bank, 2014 WL 1652550, at *9. Rather it is sufficient that Plaintiffs knew, or should have known, that the position of the handlebars relative to the alignment of the front wheel was relevant to the Defendants' theory of the accident yet engaged in purposeful activity to correct that alignment prior to trial, all the while insisting to the jury and to the Court that the bicycle was "in exactly the same condition." In light of the above, the Court finds that the instruction given was warranted, as this was clearly a purposeful act to alter the condition or appearance of an essential piece of evidence, and such an alteration amounts to, at the very least, negligence or "culpable carelessness."

   3. *Relevance of Lost Evidence*

Contrary to Plaintiffs' suggestion, the bicycle's condition following the accident was relevant to the issue of causation in this case. Defendants have consistently advanced the theory that the accident occurred as a result of "user error," not an alleged defect in the bicycle's braking mechanism. Mr. Logan's report and testimony about his original inspection of the bicycle showed that the orientation of the handlebars and front tire was off by 30 degrees, which

11

he opined was consistent with a "side-spill" type of accident and inconsistent with Plaintiffs' "pitch-over" theory. This "side-spill" evidence was highly relevant in that it impeached Plaintiffs' theory and witness testimony that this was a "pitch-over" accident, and the evidence instead supported Defendants' theory that this accident was caused by user error and not a defect in the braking mechanism of the product.

    4. *Resulting Prejudice*

Finally, the Court notes that the altered condition of the bicycle (specifically, the position of the handlebars relative to the alignment of the front wheel) was prejudicial to Defendants at trial. Although Mr. Logan had still-frame pictures of the bicycle in its original orientation that were taken during his original inspection in 2015, there is potentially more impeachment available on photographic evidence, particularly when it is at odds with the demonstrative in the courtroom that the opposing side is insisting remained unchanged from the time of the accident. Defense counsel made this very argument in his request for the spoliation instruction. (Tr.[4] at 8-9). However, because, in the Court's view, the prejudice to Defendants, while not insignificant, was not case-determinative, the Court declined to use Defendants' proposed spoliation instruction[9] and instead opted to instruct the jury that they could, though they were not required to, consider the altered condition, and they also could conclude that the condition of the bicycle as it existed during Mr. Logan's inspection was more favorable to Defendants' theory of the case. The Court did not attribute a specific cause to that change in condition, nor did the Court speculate or encourage the jury to speculate about what brought about that change in condition.

---

[9] Defendants requested that the Court give a spoliation instruction that was not permissive. That is, they requested that the instruction read, in relevant part: "Therefore, you [shall, should, or must] infer that the position of the front wheel relative to the handlebar was in a condition favorable to the Defendants, and unfavorable to the Plaintiffs before this change." (Tr.[4] at 17).

12

In addition to the above analysis, the Court declines to find prejudicial error on the basis of this instruction two other reasons. First, regardless of any instruction by the Court, Defendants had pictures of the orientation of the handlebars from Mr. Logan's inspection that were different from their orientation at trial. Absent some instruction from the Court, the jury would have been free to speculate for themselves how and why the bicycle had been changed and what significance this should have in their deliberations. If anything, the Court's instruction was more favorable to Plaintiffs as it merely informed the jury that they could, but were not required to, consider the changed condition in the bicycle and how that changed related to the parties' respective theories of causation. In other words, the Court simply told the jury how to evaluate evidence that was already coming into the case. Second, even if the Court erred in giving this instruction, such an error was harmless as the change in the position of the handlebars relative to the alignment of the front wheel of the bicycle went to the issue of *causation*, and the jury never reached the issue of causation on the verdict sheet.

### C. Juror Inspection and Testing of the Bicycle

Next, Plaintiffs contend that the Court erred in prohibiting the jury from inspecting[10] and touching the bicycle and not allowing the bicycle to go into the jury room during deliberations. This issue was originally raised and discussed in a pretrial motion in limine in which the Court issued a written ruling. (ECF No. 101). Upon reconsideration of this issue, the Court believes that the concerns outlined in that ruling were compelling, and the decision to preclude juror inspection and testing of the bicycle was proper.

---

[10] It is not entirely clear what Plaintiffs mean by "inspecting." The Court did allow the bicycle in the courtroom as an exhibit, but did not allow in-court testing of the bicycle. Further, the Court advised the parties that if the jurors needed to visually inspect the bicycle during deliberations, they could be brought back into the Courtroom to do so. The Court did not allow the jurors to test the bicycle during the trial and did not allow the bicycle to go back to the jury room in an unmonitored fashion which would risk the potential for unsupervised "testing" by the jurors.

13

First, such testing would be outside the layperson's experience and would potentially be confusing and misleading, and therefore unfairly prejudicial in violation of Federal Rule of Evidence 403. Indeed, Plaintiffs' theory—that there was a defect in the bicycle's braking mechanism—relied extensively on expert testimony. In particular, Plaintiffs elicited testimony from their expert, Mr. Kristopher Macalinao, in which he stated that he conducted the "two finger test," an "industry standard" test for bicycle mechanics. (Tr.[1] at 147-148, 158). Similarly, Plaintiffs sought to impeach Defendants' expert, Mr. Logan, for not utilizing the Consumer Product Safety Commission testing (referred to in this litigation as "the ten-pound test"), a more technical product safety test that incorporates the use of a scale to measure the force required to apply a bicycle's handbrake. Accordingly, Plaintiffs essentially assert that a lay person, with no training, expertise or tools, is capable of evaluating the force required to pull a bicycle's handbrake and compare it to the relevant industry standards in a sufficiently reliable way so as to satisfy the Federal Rules of Evidence. The Court does not accept this assertion.

Simply because many, if not all, members of the jury may have had some experience with riding a bicycle at some point in their lives, it does not mean that they are qualified to perform a test about the force required to squeeze a brake lever and be able to competently compare that force to a government regulation or industry standard in a reliable way. Jurors' past bicycle-related experiences and grip strength will likely vary, their understanding and interpretation of the applicable standards is unknown, and counsel would not have had the opportunity to question these jurors on such pertinent matters. Moreover, members of the jury may be inclined to value their own evaluation of the brake lever over an expert opinion in the case. Barnes v. Gen. Motors Corp., 547 F.2d 275, 277 (5th Cir. 1977) ("The problem presented

by the use of experiments is the danger of misleading the members of the jury who may attach exaggerated significance to the test").

Additionally, even if the Court had withheld its final determination regarding Plaintiffs' request for a juror inspection of the bicycle until after a foundation had been laid, the Court would have still been justified in ultimately prohibiting such an inspection because of the obvious changes in the bicycle's condition, in particular the alterations to the hand brake. Any in-court inspection would have required jurors to not only conduct an industry standard test that they likely had no experience in performing, but to do so while also taking into account undisputed changes in the bicycle's condition and figuring out whether and to what extent those changes would affect the validity of such a test. Again, such a determination falls outside the ken of a layperson.

Lastly, the Court also notes that Plaintiffs were otherwise permitted to introduce ample evidence to support their defect theory. T.G. was permitted to testify about her memory of the alleged brake failure. Plaintiff's expert was allowed to testify that the brake contained a defect, supported by a video of his product inspection setting forth the physical evidence in support of his defect theory, as well as his testimony regarding out-of-court "two finger testing" of the brake both at the time of his original inspection and again just prior to trial. Therefore, in the context of this testimony and evidence, disallowing the proposed juror testing does not justify a new trial.

### D. Jury Inspection of the Bicycle to Impeach Expert Testimony

In their next argument, Plaintiffs again claim that the jurors should have been able to test and examine the bicycle, adding that such an examination would have allowed the jury to assess the credibility of the parties' experts. Specifically, Plaintiffs state:

15

> Up until the last day of trial, Defendants always affirmatively maintained that the back brake was functioning based on Mr. Logan's two finger test. Mr. Logan's testimony from his deposition made no mention of the contention that the rear brake was difficult to squeeze, and on the contrary, Mr. Logan contended that the back brake was within normal limits. Mr. Logan testified in the middle of trial however that the brake was much harder to squeeze now than it had been when he inspected the bike. He used no objective testing whatsoever to support his testimony. Yet, the Court still excluded Plaintiffs' ten-pound test conducted by Mr. Macalinao to demonstrate that Mr. Logan was wrong all along. The Court also prohibited the jury from feeling the brake to call into doubt Mr. Logan's credibility. Even after Mr. Logan's in-court inspection, the jury still was not permitted to touch the brake. To the extent touching the brake would have allowed the jurors to weigh the credibility of the expert witnesses, the Court did not allow it. Permitting the jury to examine physical evidence is relevant to the extent the jury can weigh the credibility of the expert witnesses. The jury should have been allowed to feel the back brake in order to judge which of these witnesses was telling the truth.

The Court disagrees. In addition to the reasons set forth above, Plaintiffs cannot explain how a jury's own "testing" of the bicycle would have been helpful in determining whether Mr. Logan was telling the truth. Upon conducting his in-court inspection, Mr. Logan testified that the brake was significantly more difficult to apply than his previous 2015 inspection. Yet no member of the jury had ever touched the bicycle; not at the time of the accident, not at the time of the Mr. Logan's 2015 inspection, and at no time during the course of the trial. Accordingly, even if the Court had permitted the jury to manipulate the brake at trial, they would have had no context or prior experiences with the bicycle for purposes of evaluating that in-court inspection. That is, there would be no frame of reference. Any in-court inspection of the bicycle brake would not have helped the jury in determining whether, in fact, the brake had undergone any alteration, as Defendant's expert had suggested, because they would not know what the brake felt like at the time of Mr. Logan's inspection in 2015 or at any other point prior to trial.[11]

---

[11] As it relates to the condition of the hand brake, Plaintiffs also stated that "Defendants offered no evidence to support their change in condition theory." This is completely refuted by Mr. Logan's videotaped demonstration of the two-finger test at the time of his inspection, contrasted with his testimony about the condition of the brake at the

Similarly, Mr. Logan's testimony after his latter in-court inspection of the brake was substantively the same as that of Plaintiffs' expert, Mr. Macalinao: the brake was difficult to apply. It is unclear how permitting juror manipulation of the brake could have impeached Mr. Logan's credibility, as an in-court investigation would not provide any insight into the previous condition that formed the basis of Mr. Logan's opinion. Therefore, permitting the jury to manipulate the bicycle for themselves would have little relevance to the issue of expert credibility.

### E. Admission of the Ten-Pound Test

In their final argument, Plaintiffs revisit another issue that was raised and addressed in the Court's resolution of the pretrial motion in limine. (ECF No. 101). Plaintiffs, again, claim that the Court erred in excluding evidence of the "ten-pound test" that Plaintiffs' counsel, and apparently Mr. Macalinao, conducted prior to trial. The Court's explanation then, and now, is that the exclusion of this evidence was properly based on a failure by Plaintiffs to comply with Rule 26(a)(2)(A-B, E).[12]

Because of this failure to disclose, Defendants were denied a meaningful opportunity to conduct discovery regarding such testing. Such discovery could have yielded impeachment evidence regarding whether Plaintiffs' expert was trained in performing the "ten-pound test,"

---

time of trial, along with his inspection photographs that demonstrate a mis-seating of the brake cable's barrel compared to its re-alignment at the time of trial.

[12] Ace Am. Ins. Co. v. McDonald's Corp., No. CIV.A. GLR-11-3150, 2012 WL 2523883, at *2 (D. Md. June 28, 2012) ("Federal Rule of Civil Procedure 26(a)(2)(A) requires litigants to disclose the identity of any witness they may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705. Rule 26(a)(2)(B) further requires litigants to produce written reports for any witness who is retained or specially employed to provide expert testimony in the case"); see also EEOC v. Freeman, 961 F. Supp. 2d 783, 797 (D. Md. 2013), aff'd in part sub nom. E.E.O.C. v. Freeman, 778 F.3d 463 (4th Cir. 2015) ("Rule 26(e) requires that an expert report be supplemented when a party learns that in some material respect the disclosure or response is incomplete or incorrect") (internal citations omitted).

17

whether he had conducted that test previously,[13] whether the scale that they used during the testing was calibrated, whether the set-up of the test was appropriate, or whether any notes, results or other documentation was prepared in concert with that testing. Furthermore, based on the pleadings and oral argument, it appears that Defense counsel was told that there were no additional reports from Mr. Macalinao and that he would not be offering additional opinions. (Tr.[1] at 32-33). As such, the Court, pursuant to Federal Rule of Civil Procedure 37, appropriately disallowed Plaintiff's expert from offering any opinions about the ten-pound testing. See S. States Rack And Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 595 (4th Cir. 2003) ("Rule 37(c)(1) provides that a party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial ... any witness or information not so disclosed") (internal citations omitted).

For the foregoing reasons, Plaintiffs' motion for a new trial (ECF No. 125) is DENIED.

Dated: May 17, 2017

/s/
J. Mark Coulson
United States Magistrate Judge

---

[13] Presumably Mr. Macalinao was not trained or experienced in conducting this sort of test, as Plaintiffs' counsel represented to the Court that they relied on Mr. Logan's deposition testimony in which he set forth instructions on how to conduct this test. (Tr.[1] at 30-34).